DIF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

FRED BAILEY, JR.,

                   Plaintiff,

        -against-

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-2858 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Fred Bailey, Jr. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c),

seeking judicial review of the decision of the Social Security Administration (the "SSA") that he

is not disabled and therefore does not qualify for Social Security Disability Insurance ("SSDI")

and Supplemental Security Income ("SSI") benefits. (See Compl. (Dkt. 1) ¶ 1.) Plaintiff alleges

that the SSA made multiple errors in denying his application for benefits and that the decision

was neither supported by substantial evidence nor evaluated correctly under the relevant legal

standards. Defendant Carolyn W. Colvin, the Commissioner of Social Security (the

"Commissioner") has filed a motion, and Plaintiff has filed a cross-motion, for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Def.'s Not. of Mot. (Dkt. 22);

Pl.'s Not. of Mot. (Dkt. 26).) For the reasons set forth below, the Commissioner's Motion is

DENIED, Plaintiff's Cross-Motion is GRANTED, and this case is REMANDED to the SSA for

further proceedings.

## I.    BACKGROUND

Plaintiff was born on August 2, 1964. (See Administrative R. ("R.") (Dkt. 9) at 71.) He did not graduate from high school but received a General Education Diploma ("GED").[1] (Id. at 40.) He last worked as a cook at Fripp Island Resort and Brays Island Resort from 1990 through May 2008. (See id. at 43, 66.) This position required Plaintiff to be walking, standing, or stooping for most of the day. (Id. at 169.) Plaintiff frequently was required to unload food parcels weighing between 25 and 50 pounds from delivery trucks. (Id.) During that same time period, Plaintiff also worked as a stock clerk and driver for Coca-Cola, Publix, Wal-Mart, K-Mart, and Winn-Dixie. (See id. at 43-44.) Sometime before 2008, Plaintiff was involved in two car accidents and sustained a gunshot wound to his leg. (Id. at 44.) Plaintiff has not worked or looked for work since May 3, 2008. (Id. at 42.) Plaintiff testified that he applied for and received unemployment insurance benefits from approximately 2008 through 2010. (Id.)

### A.    Medical Evidence

#### 1.    Medical History 2006-2007

Medical records for the two years prior to Plaintiff's disability onset date of May 3, 2008,[2] reveal a history of non-insulin dependent diabetes. (Id. at 222, 227, 230, 237, 241, 246, 251.) However, many of the records—most of which are from emergency room ("ER") visits for a variety of conditions—note that Plaintiff has run out of or has not been taking Glucophage or other prescribed medication for his diabetes. (See id.

---

[1] Plaintiff's GED receipt date is not included in the Record.

[2] In his pro se Complaint, Plaintiff listed his disability onset date as April 21, 2010. (See Compl. (Dkt. 1) ¶ 5.) The medical records and testimony do indicate an onset date closer to April 21, 2010; however, because Plaintiff consistently used the May 3, 2008, onset date in his SSI and SSDI applications, at his hearing, and in his appeal, the court will treat May 3, 2008, as the date of onset for the sake of consistency. If Plaintiff's application is later reevaluated for the granting of benefits, the SSA would be well-advised to determine the actual date of onset.

at 222, 227, 233, 241, 254, 262.) On August 14, 2006, Dr. Gary L. Morrison—who treated Plaintiff at the Halifax Medical Center Emergency Express Care—noted that Plaintiff reported that in addition to being out of Glucophage, he "does not have any money for test strips, so he has not been checking his sugar at home." (Id. at 227.) Subsequently, Dr. Ginny Kwong referred Plaintiff to Dr. Benigno Digon, III of Halifax Community Health Systems for a diabetes consultation. (Id. at 258.) During the course of that July 9, 2007, consultation, Dr. Digon noted that Plaintiff reported no musculoskeletal or back pain. (Id. at 259.)

On September 17, 2007, Plaintiff was admitted to the Halifax ER for chest pain. (Id. at 270.) Plaintiff was evaluated and released after undergoing an echocardiogram, electrocardiograph, and stress test, all of which produced negative results. (See id. at 277-78, 290.) During an evaluation, ER physician Kirby Haws, D.O. noted that Plaintiff reported no joint or musculoskeletal pain. (Id. at 285.)

> 2.    Dr. Goettle[3]

On March 26, 2010, Dr. Goettle saw Plaintiff at Good Neighbor Medical Clinic ("Good Neighbor") for a prostate infection and hip pain. (Id. at 336, 340.) During his evaluation, Dr. Goettle noted that Plaintiff was experiencing pain in both hips, and he subsequently ordered a pelvic x-ray which showed that Plaintiff had severe bilateral hip osteoarthritis. (Id. at 336.) After reviewing the results of the x-ray, Dr. Goettle noted that they "explain[ed] the problem." (Id. at 339.) Dr. Goettle then referred Plaintiff to see Dr. Evan Reese, Jr. in order to "see if anything but replacement will help." (Id.) After referring Plaintiff for hip and joint pain, Dr. Goettle continued to treat Plaintiff for diabetes and hypertension. (See id. at 324-25.)

---

[3] Dr. Goettle's first name is not included in the Record.

Additionally, on December 6, 2011, Dr. Goettle prescribed Celexa after Plaintiff expressed that he was depressed and having difficulty sleeping. (See id. at 441-42.)

### 3.    Dr. Evan Reese, Jr.[4]

Dr. Reese is an orthopedic specialist at Good Neighbor. (Id. at 10.) He began treating Plaintiff for hip pain on April 13, 2010, after receiving a referral from Dr. Goettle. (Id. at 339.) During his first evaluation of Plaintiff on April 13, 2010, Dr. Reese noted that Plaintiff had hip pain that radiated down his legs and inhibited his sleep. (See id.) Dr. Reese diagnosed Plaintiff with bilateral hip osteoarthritis, for which he prescribed Meloxicam. (See id.) During a reevaluation on May 15, 2010, Dr. Reese prescribed Feldene and Lisinopril and further diagnosed Plaintiff with bilateral degenerative disease of the hips. (See id. at 337.) Plaintiff again saw Dr. Reese at Good Neighbor for knee pain, hip pain, and neuropathy of lower extremities on May 11, 2010, September 12, 2010, October 12, 2010, January 18, 2011, and March 29, 2011. (See id. at 320, 326, 337.)

On March 29, 2011, Dr. Reese completed a medical source statement concerning the nature and severity of Plaintiff's conditions. (See id. at 475-80.) In the statement, Dr. Reese indicated that he had treated Plaintiff for two years[5] for degenerative arthritis of the lumbosacral spine, bilateral hips, and left knee. (Id. at 475.) He stated that Plaintiff's pain was chronic, and he noted "positive objective signs" of reduced range of motion, joint deformity, impaired sleep, swelling, and muscle spasm. (Id.) Dr. Reese listed his prognosis for Plaintiff as "guarded." (Id.) He further noted that Plaintiff was capable of low stress jobs but that Plaintiff often "experiences

---

[4] Both the Administrative Law Judge (the "ALJ") and Defendant erroneously refer to Dr. Reese as "Dr. Reeset."

[5] According to the Record, at this point Dr. Reese had only treated Plaintiff for approximately one year and not two years. When Dr. Reese reviewed and re-signed this statement in November of 2011, he had been treating him for approximately a year and a half. However, Dr. Reese did treat Plaintiff through 2012. (R. at 481.)

pain severe enough to interfere with attention and concentration." (Id. at 476.) He added that Plaintiff takes pain medication that causes drowsiness, can only sit or stand in 30-minute increments, must walk for five minutes every 45 minutes, would need frequent unscheduled breaks, and likely would be absent from a job about four days per month due to impairments or treatment. (Id. at 478-80.) Additionally, Dr. Reese noted that Plaintiff occasionally could lift less than 10 pounds and could rarely stoop or bend. (Id. at 479.) On November 8, 2011, Dr. Reese reviewed and re-signed the assessment, confirming its continued accuracy. (Id. at 480.)

On February 21, 2012, Dr. Reese completed an excused absence form for Plaintiff, stating that Plaintiff was "unable to work due to medical condition relating to 1. Spinal stenosis, 2. Degenerative arthritis of the hips, 3. Diabetes mellitus, 4. Diabetic neuropathy." (Id. at 481.) He further noted that Plaintiff had been under his care since April 13, 2010. (Id.)

### 4. Dr. Joseph Gonzalez and Dr. Jeffrey Nugent

On February 17, 2011, Dr. Joseph Gonzalez, a medical consultant, examined the Record for the purpose of disability determination. (See id. at 307-09.) After conducting the Physical Residual Functional Capacity Assessment ("PRFC Assessment"), Dr. Gonzalez concluded in Form SSA-4734-BK that Plaintiff was capable of lifting up to 10 pounds and standing or walking for at least two hours during the course of an eight-hour workday. (Id. at 310.) On February 25, 2011, Dr. Jeffrey Nugent completed Form SSA-392 and, in so doing, concurred with Dr. Gonzalez's Form SSA-4734-BK assessment. (See id. at 317-18.)

### 5. Other Medical Evidence

Plaintiff visited the Beaufort ER ("Beaufort") on June 19, 2010, for pain and swelling in his knee, which had not been caused by any injury. (See id. at 378-82.) An x-ray of Plaintiff's left knee showed joint space narrowing and osteophyte formation, indicating osteoarthritis. (Id.

at 377.) After administering Torodol for pain, certified physician's assistant ("PA-C") Amanda Beasley-Kessler discharged Plaintiff with a bandage wrap, prescriptions for pain medications Anaprox and Ultram, and a diagnosis of chronic osteoarthritis of the left knee. (See id. at 382.) In Plaintiff's discharge report, PA-C Beasley-Kessler noted that Plaintiff's knee pain was "new." (Id. at 382.) Both PA-C Beasley-Kessler and registered nurse ("RN") Bonnie Rogers recorded that Plaintiff was smiling, laughing, and making jokes with others while at Beaufort. (See id. at 378, 382.)

On March 16, 2011, physicians at Beaufort performed a magnetic resonance imaging test ("MRI") of Plaintiff's spine. (See id. at 361-62.) Dr. William Jackson and Dr. James C. Balvich found that Plaintiff had a congenitally small spinal canal, spinal stenosis, some disk bulging, some tightly compressed nerve roots, and some slight ligamentous hypertrophy. (Id.) Three days later, on March 19, 2011, physicians at Beaufort performed a computerized tomography scan ("CT scan") of Plaintiff's lumbar spine. (Id. at 354.) Dr. Jackson and Dr. Saeed U. Rehman found that Plaintiff had mild facet osteoarthritic changes in addition to very mild disk bulging. (Id. at 354-55.) Plaintiff subsequently reviewed the results of both tests with Dr. Reese at Good Neighbor on March 29, 2011. (See id. at 320.) Dr. Reese recorded that the test results indicated degenerative disc and facet disc disease. (Id.) Dr. Reese additionally noted that Plaintiff was taking prednisone and Percocet, as prescribed. (Id.)

On April 6, 2011, Plaintiff visited Beaufort for chronic back and hip pain. (Id. at 349.) RN Eva Saxon noted that Plaintiff was taking metformin, glipizide, an unknown arthritis medication, Vicodin, and lisinopril. (Id.) RN Lisa Shapiro noted that Plaintiff reported the pain beginning a year prior and that Plaintiff was quiet and stoic. (Id.) Dr. Rehman had Toradol, morphine, and Valium administered to Plaintiff and subsequently discharged him when his pain

6

had abated. (See id. at 350.) On June 17, 2011, an x-ray taken at Beaufort of Plaintiff's left knee revealed osteoarthritis, for which additional pain medication was administered and prescribed. (See id. at 343-45.) During that visit, RN Rogers noted that Plaintiff complained of being unable "to perform activities of daily living." (Id. at 344.) Plaintiff made additional ER visits for hip, back, and leg pain on August 13, 2011, and October 31, 2011. (See id. at 424, 455.)

## B.    Other Evidence

### 1.    Plaintiff's Testimony

During his January 18, 2012, hearing before Administrative Law Judge Augustus C. Martin (the "ALJ"), Plaintiff testified that he had not worked or looked for work since May 3, 2008. (See id. at 42.) Plaintiff reported that he had "chronic joint pain" in his hips and lower extremities, in addition to suffering from "back spasms every day, all day pretty much when I become physical." (Id. at 45.) When asked by the ALJ about the severity of his pain, Plaintiff testified that it was "intense to the point where sleeping is very uncomfortable" and that he often had to get up and walk around during the night "because of the back spasms and the arthritis when it flares." (Id. at 46.) When asked what sort of treatment he had received, Plaintiff testified that because he had no medical insurance, his treatment generally consisted of being "just given some pills, glass of water." (Id. at 47.) He added that he had not received any physical treatment or physical therapy of any sort and that he had been prescribed and took Lortab, Percocet, Valium, and Feldene, in addition to diabetes medications. (Id.) When asked about side effects, Plaintiff responded that the pain medications caused dizziness, nausea, and excessive sweating. (Id.) When the ALJ asked if Plaintiff's activities had been restricted by his doctors, Plaintiff responded that ER doctors had told him to elevate his legs and walk around.

(Id. at 48.) Additionally, Plaintiff said that, in jest, his doctor had remarked: "If we can find a job that you can lie down on, you'll be okay." (Id. at 46.)

Plaintiff reported that at home he was able to prepare meals, wash dishes, wash laundry by hand, and go shopping, so long as he could sit down frequently. (See id. at 50-54.) Plaintiff added that he walked his dog once a day for exercise but that he "can't walk as much as [he] would like to because of the . . . back spasm, [and his] legs get weak." (Id. at 51-53.) Plaintiff reported that he was able to take care of his personal hygiene but had a difficult time dressing himself. (See id. at 49-53.) Plaintiff further stated that while he previously was able to lift upwards of 50 pounds, he could no longer do "any heavy lifting at all." (Id. at 55.)

When asked by his attorney about his pain, Plaintiff responded that he was "in pain pretty much every day . . . that's most of the day." (Id. at 56.) He added that he spent approximately 25% of the day lying down, one hour at a time with intermittent walking or sitting breaks. (Id.) When asked about his ability to walk, Plaintiff responded that he could walk short distances but would begin to feel pain in his legs when walking farther than 50 yards. (See id. at 57-58.)

### 2. Vocational Expert Dr. Art Schmitt

Vocational expert Dr. Art Schmitt also testified at the hearing before the ALJ. (See id. at 60-64.) After Dr. Schmitt had reviewed Plaintiff's file and listened to his testimony, the ALJ asked him to consider a hypothetical individual, describing one who could do sedentary work, occasionally use foot controls, frequently use car pedals, could not climb ladders, ropes, or scaffolds, could not crawl, could occasionally perform other postural movements, and must avoid exposure to hazards. (Id. at 61.) First noting that such an individual would be unable to perform Plaintiff's past work, the ALJ then asked Dr. Schmitt what sort of work such an

individual would be able to perform. (Id.) Dr. Schmitt replied that such an individual could perform the jobs of surveillance system monitor, ticket seller, weight tester, and telephone quotation clerk. (Id. at 62.) The ALJ then asked Dr. Schmitt if there were any jobs in which an individual could lie down for one or two hours per day. (Id.) Dr. Schmitt responded that such a requirement would "eliminate those jobs and any other jobs on the national economy." (Id. at 63.)

## II.    PROCEDURAL HISTORY

On April 21, 2010, Plaintiff filed applications for SSDI and SSI benefits in South Carolina, where he resided at the time. (See id. at 129-36.) The SSA denied both applications on August 11, 2010. (Id. at 65-66.) Plaintiff filed a request for reconsideration on August 20, 2010 (id. at 79), which the SSA denied on February 17, 2011 (id. at 80-83). On March 22, 2011, the SSA appointed South Carolina attorney Caroline Meng as Plaintiff's representative. (Id. at 84.) The next day, Meng filed a request for a hearing before an ALJ (id. at 86), which was held on January 18, 2012 (id. at 96). On February 1, 2012, the ALJ issued a written determination that Plaintiff was not disabled within the meaning of the Social Security Act, denying Plaintiff's applications for SSDI and SSI benefits. (Id. at 28.) On March 22, 2012, Meng requested that the SSA Appeals Council review the ALJ's unfavorable decision. (Id. at 9.) The Appeals Council denied the request for review on April 16, 2013, upholding the ALJ's determination. (Id. at 1.)

On May 13, 2013, Plaintiff filed the instant action pro se, seeking judicial review of the SSA's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (See Compl. ¶ 1.) On July 26, 2013, the court granted Plaintiff's application to proceed in forma pauperis under 28 U.S.C. § 1915. (See Order (Dkt. 4).) On October 29, 2013, the Commissioner filed her Answer,

along with a copy of the administrative record. (See Answer (Dkt. 10).) On February 24, 2016, New York attorney Harold Skovronsky filed a notice of appearance on behalf of Plaintiff. (See Not. (Dkt. 14).) The Commissioner and Plaintiff have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (See Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem.") (Dkt. 23); Mem. of Law in Opp'n ("Pl.'s Mem.") (Dkt. 24).)

## III.  LEGAL STANDARD

### A.  Review of Final Determinations of the Social Security Administration

Under Federal Rule of Civil Procedure 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved that [he] is entitled to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 1990) (internal quotation marks omitted). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) the ALJ's findings are

10

supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at \*9.

## B.  Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Social Security Act if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Social Security Act. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" set forth in . . . the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

11

> If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.
>
> If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (citations omitted).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (citation and internal quotation marks omitted). But if the claimant shows at step four that his impairment renders him unable to perform his past work, there is a limited shift in the burden of proof at step five that requires the Commissioner to "show there is other gainful work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10 (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). Moreover, "the ALJ conducting the administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits." Id.

## C.    Treating Physician Rule

Under the SSA's regulations, "a treating physician's report is generally given more weight than other reports." Snell v. Apfel, 177 F.3d 128, 133 (2d. Cir. 1999). A "treating physician" is a physician "who has provided the [claimant] with medical treatment or evaluation, and who has or who had an ongoing treatment and physician-patient relationship with the individual." Sokol v. Astrue, No. 04-CV-6631 (KMK) (LMS), 2008 WL 4899545, at *12 (S.D.N.Y. Nov. 12, 2008). The SSA's "treating physician rule" requires an ALJ to give a treating physician's opinion "controlling weight" if "the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c). On the other hand, "[w]hen other substantial evidence in the record"—such as other medical opinions—"conflicts with the treating physician's opinion, that opinion will not be deemed controlling." Snell, 177 F.3d at 133. In addition, "some kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner" and therefore are never given controlling weight. Id. (internal quotation marks omitted).

Even where an ALJ does not give controlling weight to a treating physician's opinion, the ALJ must consider several factors to determine how much weight to give the opinion. See 20 C.F.R. § 404.1527(c)(2). Specifically, the ALJ must consider "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schall v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); see also 20 C.F.R. § 404.1527(c)(2)-(6). While an ALJ need not mechanically

recite each of these factors, he or she must "appl[y] the substance of the treating physician rule." Halloran v. Bernhart, 362 F.3d 28, 32 (2d Cir. 2004). The court will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in concluding that he was not disabled under the Social Security Act. (Pl.'s Mem. at 5.) Plaintiff alleges that the ALJ incorrectly rejected the findings of Plaintiff's treating physician, Dr. Reese, in favor of those of a non-examining physician, Dr. Gonzalez. (Id. at 7.)

Plaintiff does not dispute the ALJ's determinations for the first three steps of the five-step analysis, namely that: (1) Plaintiff has not engaged in substantial gainful activity since May 3, 2008; (2) Plaintiff suffers from osteoarthritis of the hips, knees, and back, diabetes, hypertension, and obesity, the combination of which causes more than minimal functional limitations; and (3) Plaintiff does not suffer from an impairment that meets the SSA's Listing of Impairments.[6] (See R. at 20.) However, Plaintiff argues that the ALJ erred in his step four determination of Plaintiff's residual functional capacity, leading to a step five decision unsupported by substantial evidence. (Pl.'s Mem. at 5.) At step four, the ALJ determined that Plaintiff "has the residual functional capacity to perform sedentary work as defined by 20 C.F.R. 404.1567(a) and 416.967(a)," finding that Plaintiff can:

---

[6] While Plaintiff did not specifically object to the ALJ's findings as they relate to the Listing of Impairments, the court notes that the ALJ's step three analysis was incomplete. The court addresses this issue in more depth in Section IV.B.

lift and carry up to 10 pounds occasionally and lesser amounts frequently; can sit for up to six hours in an eight-hour day with normal breaks; can stand and walk for up to two hours each in an eight-hour day with normal breaks; can occasionally operate foot controls; can frequently operate car pedals; cannot climb ropes, ladders, or scaffolds; cannot crawl; can occasionally balance, climb ramps and stairs, stoop, crouch, and kneel; must avoid concentrated exposure to hazards; and must have the ability to alternate positions at will.

(R. at 21.) Plaintiff alleges that the ALJ erred in his assessment of the medical evidence, incorrectly weighing a non-examining physician's opinion over that of the treating physician. (Pl.'s Mem. at 7.)

## A.     Whether the ALJ Abided by the Treating Physician Rule

Plaintiff argues that the ALJ erred in concluding that he was not disabled under the Social Security Act, by improperly assigning greater weight to the opinion of Dr. Gonzalez, a non-examining physician, than to the opinion of Dr. Reese, Plaintiff's treating physician. (Id.) The court agrees that the ALJ did not assign the appropriate weight to the medical opinions of Dr. Reese and Dr. Gonzalez.

### 1.      Weight Given to Opinions of Dr. Reese and Dr. Gonzalez

Plaintiff states that the ALJ gave too much weight to the opinion of Dr. Gonzalez and too little weight to the opinion of Dr. Reese. The ALJ assigned "great weight" to Dr. Gonzalez's opinion as stated in his PRFC Assessment of Plaintiff. (R. at 25.) It is undisputed that Dr. Gonzalez is not a treating physician but, rather, is a medical consultant for the SSA. In making his PRFC determination, Dr. Gonzalez never personally examined or met with Plaintiff. (Id. at 10.) Dr. Gonzalez's determination was based entirely on medical records provided up to the point of assessment, February 17, 2011. (See id. at 309-16.) Consequently, Dr. Gonzalez did not have the opportunity to review the results of the March 16, 2011, MRI or the

March 19, 2011, CT scan of Plaintiff's lumbar spine. (See id. at 321-22.) By contrast, the ALJ assigned "some weight" to Dr. Reese's opinion as stated in his Medical Source Statement concerning Plaintiff's health. (Id. at 26.) Dr. Reese treated Plaintiff regularly for osteoarthritis and associated pain for over two years (id. at 10), during which time he reviewed and made note of the results of Plaintiff's March 2011, MRI and CT scan (id. at 320). Dr. Gonzalez and Dr. Reese differ in their respective reports as to Plaintiff's physical capacity during an eight-hour work day: Dr. Gonzalez found that Plaintiff could sit for "about 6 hours in an 8-hour workday" (id. at 310), while Dr. Reese asserted that Plaintiff can sit for only four hours during the course of "an 8 hour working day" (id. at 477). Additionally, Dr. Reese noted that Plaintiff likely was only capable of low stress jobs due to "episodes of pain caused by stressful positions, [and] activities" (id. at 476), and so must take walking breaks every 45 minutes and must rest for 20 minutes every two to four hours (see id. at 478). Though other physicians who treated Plaintiff did not make note of his capacity to work, Dr. Goettle, Dr. Jackson, and Dr. Rehman all diagnosed Plaintiff with a variety of serious afflictions. (See id. at 336, 354-55, 361-62.)

While Dr. Reese's determinations as to Plaintiff's vocational abilities are consistent with the findings of Dr. Goettle, Dr. Jackson, and Dr. Rehman, in addition to multiple test results, they normally would not be subject to controlling weight because they conflict with the findings of Dr. Gonzalez. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (holding that the treating physician's opinion is not given controlling weight when it is contradicted by "by other substantial evidence in the record"). However, because Dr. Gonzalez was a non-examining physician, his findings may be deemed "not sufficiently substantial to undermine the opinion of the treating physician." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (noting instances when courts have chosen not to find evidence substantial, such as "where the expert was a

consulting physician who did not examine the claimant and relied entirely on an evaluation by a non-physician reporting inconsistent results"). If Dr. Gonzalez's report is discounted as "not sufficiently substantial," then Dr. Reese's opinion appears to be consistent with all other substantial evidence included in the record, including the opinions of other doctors who examined Plaintiff. Cf. Halloran, 362 F.3d at 32 (holding that a treating physician's opinion was not owed controlling weight because it was inconsistent with opinions of "several other medical experts").

The Commissioner asserts that the ALJ was correct in affording Dr. Reese's opinion only "some weight" because the examining doctor's opinion of disability cannot "itself be determinative." (Def.'s Mem. (citing Snell, 177 F.3d at 133).) However, in Snell, the court found that the treating physician's opinion was contradicted by the findings of multiple other doctors. See Snell, 177 F.3d at 133. Here, by contrast, the ALJ noted only that Dr. Reese's opinion was internally inconsistent and contradicted only Dr. Gonzalez's findings. See Pimenta v. Barnhart, No. 05-CV-5698 (JCF), 2006 WL 2356145, at *5 (S.D.N.Y. Aug. 14, 2006) (finding that Snell was distinguishable where a treating physician's opinion was contradicted by only one other medical opinion).

Even if the court holds that Dr. Gonzalez's report constitutes substantial evidence and thus denies controlling weight to Dr. Reese's opinion, the ALJ still must provide sufficiently "good reasons" for assigning only "some weight" to Dr. Reese's opinion as a treating physician while giving "great weight" to Dr. Gonzalez's opinion. Halloran, 362 F.3d at 33 (stating that a court will "not hesitate to remand" when the court "encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned a treating physician's opinion"). The ALJ stated that he gave only "some weight" to Dr. Reese's assessment of Plaintiff because the

17

finding that "claimant is able to walk five blocks without pain . . . appears inconsistent with the other limitations expressed in [Dr. Reese's assessment.]" (R. at 26.) The ALJ added that there is "no objective evidence to support" Dr. Reese's opinion "limiting the claimant to only six hours of work per day," noting that "other than the hips, the claimant's osteoarthritis is mild." (Id.) However, the court finds that the ALJ misconstrued the Record in summarizing Dr. Reese's opinion. Dr. Reese never stated that Plaintiff can work "only six hours of work per day." (Id.) Rather, he noted that Plaintiff is "capable of low stress jobs" but with a series of limitations on the number of hours he can stand and sit. (Id. at 476.) The ALJ did not give any explanation for how he interpreted a six-hour working limitation from Dr. Reese's report. Moreover, the ALJ did not explain how the ability to walk five blocks without pain was inconsistent with the rest of Dr. Reese's findings.

Furthermore, the ALJ did not apply any of the factors that the SSA regulations provide for determining the amount of weight to give to a treating physician's opinion which is not afforded controlling weight. See 20 C.F.R. § 494.1527(c)(2)-(6). While the ALJ need not discuss each and every factor provided, he must "appl[y] the substance of the treating physician rule." Halloran, 362 F.3d at 32. But see Seilan v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (stating that an ALJ must "explicitly consider" the factors outlined in 20 C.F.R. § 494.1527(c)(2)-(6) when determining what weight to afford a treating physician). In determining what constitutes a substantive application of the treating physician rule, the regulations themselves note that "[g]enerally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(d)(2)(i). Here, the ALJ made no mention—explicit or implicit—of any treating

physician factor. The ALJ failed to note or consider: (1) that Dr. Reese treated Plaintiff for approximately two years (R. at 475), and has seen him at least seven times during that period (id. at 214, 320, 326, 337, 339, 481); (2) that his diagnoses are both consistent with and based on the MRI and CT scan test performed by Dr. Jackson, Dr. Balvich, and Dr. Rehman (see id. at 320, 354-55, 361-62); (3) the consistency of Dr. Reese's findings with those of multiple other doctors contained in the Record (see generally id.); and (4) that Dr. Reese is an orthopedic specialist to whom Plaintiff was referred specifically for his osteoarthritis and spinal problems (id. at 10, 339).

An ALJ can choose to discount the SSA instructions to "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). However, in discounting the opinion of a specialist, the ALJ should provide "a reason to the contrary." Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 508 (S.D.N.Y. 2014) (finding that an ALJ had insufficiently applied the treating physician rule because he had not considered whether a treating physician was a specialist and so could not advance an acceptable reason for discounting their opinion). Here, the ALJ never mentioned that Dr. Reese is an orthopedic specialist and so could not, and did not, weigh his opinion as such. In fact, the ALJ erroneously stated that Plaintiff has never sought treatment from an orthopedist. (R. at 23.) Therefore, the ALJ's stated reasons and analytical process for affording only "some weight" to Dr. Reese's opinion as a treating physician are insufficient under the treating physician rule. See Garcia v. Barnhart, No. 01-CV-8300 (GEL), 2003 WL 68040, at *8 (S.D.N.Y. Jan. 7, 2003) (holding that an ALJ's failure to examine "the length . . . of the treatment," the "opinion's consistency with the record as a whole," or whether the treating physician "was a specialist" amounted to a failure to

give "good reasons" for affording "little weight" and so constituted an independent reason for remand).

The ALJ failed adequately to explain his reasoning for affording the opinion of Dr. Gonzalez—a non-treating, non-examining, SSA physician—"great weight" at the expense of the opinion of Dr. Reese. See Domm v. Colvin, 579 F. App'x 27, 28 (2d Cir. 2014) (finding that an ALJ afforded too much weight to a consulting physician who had only examined the claimant once); Pogozelski, 2004 WL 1146059, at *13 (holding that the ALJ erred in affording "more than limited weight" to the opinion of a physician who only once examined the claimant); Crespo v. Apfel, No. 97-CV-4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999) (stating that a "consulting physician's opinions or report should be given limited weight" because "they are often brief, are generally preformed without benefit or review of the claimant's medical history, and at best, only give a glimpse of the plaintiff on a single day"). While Dr. Gonzalez did have access to some of Plaintiff's medical records, he lacked the key MRI and CT scan results upon which Dr. Reese relied when diagnosing Plaintiff with degenerative disc and facet disc disease. In addition, here, unlike in Domm, Pogozelski, and Crespo, Dr. Gonzalez's opinion arguably should be afforded less than the "limited weight" afforded to a consulting physician, given that he never once examined Plaintiff. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995) (holding that in the context of SSA determinations, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician). The SSA regulations maintain that when an ALJ chooses to give more weight to a non-examining or non-treating source than a treating physician, he must explain the choice to do so. See 20 C.F.R. § 404.1527(e)(2)(ii). Here, the ALJ neither provided good reasons for the

minimal weight he gave to Dr. Reese's opinions nor gave any reasons for the great weight that he gave to Dr. Gonzalez's opinion.

## 2. ALJ's Medical Conclusions

Although Plaintiff did not raise this argument, the court finds that the ALJ improperly relied on his own judgment in forming his medical opinion as to Plaintiff's disability. When analyzing a treating physician's reports or opinions, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983); see also Balsamo, 142 F.3d at 81 (finding that an ALJ's determination that a medical finding was inconsistent with a finding of disability constituted an improper medical determination); Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (holding that an ALJ erred in diminishing the amount of weight afforded to a treating physician after attaching "significance to [an] omission" in the record). Rather than citing any specific inconsistencies between Dr. Reese's opinion and the rest of the medical record, the ALJ formed his own assessment of Plaintiff's symptoms and afflictions as "mild." (R. at 22-23, 26.) Ultimately, the ALJ's determination that Dr. Reese's opinion "is not supported by objective evidence because, other than the hips, the claimant's osteoarthritis is mild" is not based on the Record.

The Second Circuit has required that "a circumstantial critique by a non-physician, however thorough or responsible, must be overwhelmingly compelling to justify a denial of benefits." Mendolia v. Astrue, No. 10-CV-0417 (ENV), 2013 WL 3356960, at *6 (E.D.N.Y. July 3, 2013) (internal quotation marks omitted); see also Bahama v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998) (holding that the ALJ had erred in relying on his own analysis of the claimant's medical issues, "improperly set[ting] his own expertise against that of physicians who submitted

opinions to him"). As a non-physician, the ALJ impermissibly substituted his own judgment

regarding the severity of Plaintiff's osteoarthritis for that of an actual physician. The ALJ's

determination that Plaintiff's condition is "mild" fails to qualify as "overwhelmingly

compelling" such that it could justify the denial of benefits. At best, the ALJ's rejection of Dr.

Reese's opinion was "[a] circumstantial critique by a non-physician." Rosa, 168 F.3d at 79.

Independent of the reasons above, the ALJ clearly "failed to justify granting less than controlling

weight" to Dr. Reese's opinion by inserting his own non-medical opinions. Id. Accordingly,

"remand is unavoidable." Mendolia, 2013 WL 3356960, at *7.

**B.    Whether the ALJ Properly Assessed Plaintiff's Injuries at Step Three**

For the purpose of reevaluation of Plaintiff's condition on remand, the court notes that

the ALJ may have erred in assessing Plaintiff's ailments as they relate to the SSA's Listing of

Impairments. During the step three analysis, the ALJ held that "[t]he claimant's osteoarthritis of

the back does not meet Listing 1.04 of the Listing of Impairments because there is no evidence

that it is characterized by nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis

resulting in pseudoclaudication." (R. at 21.) However, in his recorded findings from the

May 16, 2011, MRI of Plaintiff's lumbar spine, Dr. Balvich observed that "[a]t the L2-3 level,

the compression of the nerve roots is even more marked as they have a very tight circle noted"

and "[a]t the L3-4 level . . . [cerebrospinal fluid] is effaced from the nerve roots and they are

tightly compressed to one another." (Id. at 361.) As stated by the ALJ, for osteoarthritis,

degenerative disc disease, or facet arthritis to qualify under Listing 1.04 (disorders of the spine),

there additionally must be either evidence of nerve root compression, spinal arachnoiditis, or

lumbar spinal stenosis. 20 C.F.R Pt. 404, Subpt. P, app. 1, § 1.04. The regulation further

requires that nerve root compression be "characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." Id.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1991) (emphasis in original). Additionally, while an ALJ should "set forth a sufficient rationale in support of his decision to find or not find a listed impairment," this court recognizes that "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" Salmini v. Comm'r of Soc. Sec., 371 F. App'x. 109, 112 (2d Cir. 2010) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)). Here, however, the ALJ's failure to provide an express rationale for his decision is accompanied by a dearth of supporting evidence in the Record. Although it is unclear from the Record whether Plaintiff's nerve root compression meets each of the Listing's requirements, it is at least clear that Plaintiff has been diagnosed with nerve root compression at multiple vertebral points. (R. at 361.) Accordingly, the ALJ's conclusion that Plaintiff's osteoarthritis did not meet Listing 1.04 is not founded in the record and should be reconsidered. Specifically, the ALJ should determine whether Plaintiff's nerve root compression is evidenced by "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." 20 C.F.R Pt. 404, Subpt. P, app. 1, § 1.04.

## V.   CONCLUSION

For the reasons set forth above, the Commissioner's Motion for Judgment on the Pleadings is DENIED, Plaintiff's Cross-Motion for Judgment on the Pleadings is GRANTED,

and this case is REMANDED to the SSA for a proper evaluation of the medical opinions and a

re-evaluation of Plaintiff's condition in light of all the medical evidence.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      July 20, 2016

NICHOLAS G. GARAUFIS
United States District Judge